# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| WILLIAM LAMAR BURRELL, | ) | CASE NO. 3:21-cv-393 (KAD) |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ANGEL QUIROS, *et al.*, | ) | DECEMBER 8, 2023 |
| *Defendants*. | ) | |

## <u>MEMORANDUM OF DECISION</u>
### RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 66)

Kari A. Dooley, United States District Judge:

In this civil rights action, Plaintiff William Burrell ("Burrell"), a sentenced inmate within the Connecticut Department of Correction, alleges that Defendants, Dr. Ingrid Feder and APRN Yvonne Marceau, were deliberately indifferent to his medical needs in violation of the Eighth Amendment to the United States Constitution when they denied and delayed him medical care for his traumatic brain injury, resulting in two emergency neurosurgeries. Pending before the Court is Defendants' motion for summary judgment in which they argue that they are entitled to judgment as a matter of law because Plaintiff cannot establish that he exhausted his administrative remedies or that Defendants were deliberately indifferent to his medical needs in violation of the Eighth Amendment. In the alternative, Defendants argue that they are entitled to qualified immunity. (ECF No. 66) For the reasons that follow, Defendants' motion for summary judgment is GRANTED as to Defendant Feder and DENIED in all other respects.

**Standard of Review**

The standard under which courts review motions for summary judgment is well established. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law," while a dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Significantly, the inquiry being conducted by the court when reviewing a motion for summary judgment focuses on "whether there is the need for a trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250. As a result, the moving party satisfies his burden under Rule 56 "by showing . . . that there is an absence of evidence to support the nonmoving party's case" at trial. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002) (per curiam) (internal quotation marks omitted). Once the movant meets his burden, the nonmoving party "must set forth 'specific facts' demonstrating that there is 'a genuine issue for trial.'" *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009) (quoting Fed. R. Civ. P. 56(e)). "[T]he party opposing summary judgment may not merely rest on the allegations or denials of his pleading" to establish the existence of a disputed fact. *Wright*, 554 F.3d at 266; *accord Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990). "[M]ere speculation or conjecture as to the true nature of the facts" will not suffice. *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citations omitted; internal quotation marks omitted). Nor will wholly implausible claims or bald assertions that are unsupported by evidence. *See Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50 (citations omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)). "In deciding a motion for summary judgment, the district court's function is not to weigh the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could find in favor of the non-moving party." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002).

**Facts and Procedural History**

The following facts are drawn from the parties' Local Rule 56(a)(1) and (a)(2) Statements of Facts ("LRS") and from the exhibits in the record. The facts set forth in Defendants' LRS (ECF No. 66-2) are largely admitted by Plaintiff (ECF No. 73) unless otherwise indicated.

On August 9, 2020, Burrell was involved in an altercation with another inmate, during which he bumped his head. Several weeks later, he was transferred to Corrigan Correctional Center. On September 10, 2020, Burrell submitted a request for medical attention, complaining of severe headaches, inability to sleep, periodic nausea, and loss of appetite. Def. LRS at 1 ¶ 4; Pl. LRS at 2 ¶ 4.[1] He was placed on the inmate sick call list. On September 13, 2020, Marceau saw Burrell for sick call. Burrell had normal vitals and a normal neurological exam. Def. LRS at 2 ¶ 7. When Burrell was seen by Marceau, his symptoms were at a "ten" on a scale of one to ten and believed that he "was dying" and like he "wasn't going to wake up in the morning." Def. LRS at 3 ¶ 19. Burrell alleges that he told Marceau that he was having problems walking, was dizzy, and had headaches for two weeks. Pl. LRS at 13 ¶ 42. He also reported that he had vomited three or four times, was losing balance when getting down from his top bunk, and had an aversion to light.

---

[1] This request alludes to a prior request Burrell allegedly made on September 9, 2020, but was not received. *See* Pl. LRS at 12 ¶ 39.

*Id.* Marceau alleges that she did not observe Burrell exhibiting any confusion, unsteadiness, or difficulty walking. Def. LRS at 2 ¶ 7.

Burrell did not report a history of head injury because he did not remember any head injury at the time. Def. LRS at 2 ¶ 7. Marceau believed Burrell's symptoms to be non-specific and noted that Burrell himself reported that his headaches had been resolved and he was not in pain. Def. LRS at 2 ¶ 8. Burrell alleges that he had a back-and-forth argument with Marceau because of the time it took medical to see him and he believed he needed a more thorough examination; he thought that Marceau did not believe his complaints and was dismissive of his health issues. Pl. LRS at 18 ¶ 62. Marceau offered Burrell Tylenol and told him to return to the medical unit if he continued experiencing symptoms. Burrell Dep. 55:5–9, 60:3–4, 60:19–20, ECF No. 66-12 at 56, 61. Burrell believes that Marceau sent him back to his housing unit. Pl. LRS at 18 ¶ 62. Marceau had no further contact with Burrell after September 13, 2020. Def. LRS at 4 ¶ 21.

On September 14, 2020, correctional officers noticed that Burrell was disoriented, and brought him to the infirmary, where he was seen by Nurse Carley Cann. Incident Rep. Ex. B, ECF No. 66-6 at 2–3. Dr. Feder evaluated him and immediately activated 911 protocols because while Burrell's vitals were normal, he was hiccupping, a sign of deeper neurological issues. Ex. A2, ECF No. 68 at 913. Burrell was thereafter transferred to a local hospital, where a CT scan revealed he had a subdural hematoma that required emergency surgery. *Id.* at 909. Burrell was flown to Hartford Hospital, where Dr. Khaled (who also serves as Plaintiff's expert witness), performed the neurosurgery. *Id.* at 850–900. Burrell remained at Hartford Hospital until September 19, 2020. *Id.* After his discharge from Hartford Hospital, Burrell remained in the Corrigan infirmary, where he received regular neurological and vitals checks, assessments, wound care, and medication. *Id.* at 789–850. At a post-surgical follow up with Dr. Khaled on September 29, 2020, a CT scan showed

an additional subdural hematoma, which also required surgery. Dr. Khaled performed the second surgery. Burrell remained inpatient at Hartford Hospital until his discharge on October 10, 2020, and thereafter stayed in the Corrigan infirmary until November 6, 2020. *Id.* at 307–789.

Defendants' expert, Dr. Phillip Dickey, opined that no provider would have known that Burrell had a subdural hematoma when he was seen on September 13, 2020 and would not have ordered a CT scan. Def. LRS at 3 ¶ 13. CT scans are usually provided when there is a history of head trauma. Def. LRS at 3 ¶ 15. Dr. Dickey reasoned that when Marceau saw Burrell on September 13, 2020, the hematoma had been likely accumulating over a few weeks. Def. LRS at 3 ¶16. Moreover, on September 13, 2020, Burrell's hematoma would have required surgery and had he been sent to the emergency room a week earlier, he would have still required surgery. Def. LRS at 3 ¶¶ 17–18. Dr. Dickey believes that the need for a second surgery was the result of an incomplete removal of the hematoma during the initial surgery. Def. LRS at 3 ¶ 20. Dr. Khaled, Plaintiff's expert, contends that the second surgery was necessitated by the fluid that he purposefully placed there during the first surgery to fill the space left by the hematoma, and because the brain did not return to its original size and shape to fill that cavity, the brain herniation continued. Khaled Aff. Ex. 1 ¶ 7, ECF No. 73-1 at 3. He opines that the brain would have re-expanded quicker but for the prolonged compression of Plaintiff's brain due to a delay in diagnosis. *Id.*

**Discussion**

As an initial matter, Plaintiff agrees that summary judgment should enter as to Dr. Feder. Accordingly, the Court considers only those arguments that pertain to Marceau. The Court finds that there are genuine issues of material fact that preclude summary judgment.

*Exhaustion of Administrative Remedies*

The Prison Litigation Reform Act ("PLRA") requires a prisoner pursuing a federal lawsuit to exhaust available administrative remedies *before* a court may hear his case. *See* 42 U.S.C. § 1997e(a) (providing in pertinent part that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *see also Ross v. Blake*, 578 U.S. 632, 635 (2016). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA requires "proper exhaustion": the inmate must use all steps required by the administrative review process applicable to the institution in which he is confined and do so properly. *Jones v. Bock*, 549 U.S. 199, 218 (2007) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out and doing so properly"). "Exhaustion is mandatory—unexhausted claims may not be pursued in federal court." *Amador*, 655 F.3d at 96; *see also Jones*, 549 U.S. at 211.

Special circumstances will not relieve an inmate of his obligation to comply with the exhaustion requirement. An inmate's failure to exhaust administrative remedies is only excusable if the remedies are in fact unavailable. *See Ross*, 578 U.S. at 642. The Supreme Court has determined that "availability" in this context means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of." *Id.* (quotation marks and internal citations omitted).

The *Ross* Court identifies three circumstances in which a court may find that internal

administrative remedies are not available to prisoners under the PLRA. *Id.* at 643–44. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id*. at 643. "Next, an administrative remedy scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id*. Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id*. The Second Circuit has noted that "the three circumstances discussed in *Ross* do not appear to be exhaustive[.]" *Williams v. Priatno*, 829 F.3d 118, 123 n.2 (2d Cir. 2016). In considering the issue of availability, however, the Court is guided by these illustrations. *See Mena v. City of New York*, No. 13-cv-2430 (RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016).

Exhaustion of administrative remedies is an affirmative defense. Thus, the defendant bears the burden of proof. *See Jones*, 549 U.S. at 216. Once the defendant presents evidence that tends to establish that administrative remedies were not exhausted before the inmate commenced the action, the plaintiff must establish that administrative remedy procedures were not available to him under *Ross*, or present evidence showing that he did exhaust his administrative remedies. *See Smith v. Kelly*, 985 F. Supp. 2d 275, 284 (N.D.N.Y. 2013) ("[O]nce a defendant has adduced reliable evidence that administrative remedies were available to the plaintiff and that the plaintiff nevertheless failed to exhaust those administrative remedies, the plaintiff must then 'counter' the defendant's assertion by showing exhaustion [or] unavailability").

Administrative Directive 8.9 provides Health Services Review procedures to address two types of issues or claims related to the medical, dental, or mental health care of an inmate: (1) diagnosis and treatment issues and (2) administrative health care issues involving a procedure,

practice, policy, or the improper conduct of a health services provider. *See* Administrative Directive 8.9(9)(A) & (B).

An inmate seeking review of an issue involving a diagnosis or treatment or an administrative health care issue involving a procedure, practice, policy, or the improper conduct of a health services provider must first attempt to seek informal resolution either by speaking to the appropriate staff member or by sending a written request to a supervisor. *Id.* at 8.9(10). The supervisor must respond to a written attempt at informal resolution within fifteen calendar days of receipt of the request. *Id.* If the informal resolution of the inmate's issue is unsatisfactory or unsuccessful, the inmate may apply for a Health Services Review using the Inmate Administrative Remedy Form, CN 9602, and checking off either the Diagnosis/Treatment box or the All Other Health Care Issues box for an administrative issue. *Id.* at 8.9(11) & (12).

If the inmate seeks review of a diagnosis or the treatment or lack of treatment of a medical, dental, or mental health condition, the Health Services Review Coordinator is required to schedule a Health Services Review Appointment with, as applicable here, a physician or APRN, as soon as possible. *Id.* at 8.9(11)(A). If, after the appointment, the physician or APRN concludes that the existing diagnosis or treatment is appropriate, the inmate is deemed to have exhausted his or her health services review remedy. *Id.* If the physician or APRN reaches a different conclusion with regard to the appropriate diagnosis or course of treatment for the inmate's condition, he or she may either provide the appropriate diagnosis or treatment or refer the case for authorization indicating the need for different treatment. *Id.* at 8.9(11)(B).

If the inmate seeks review of an administrative health care issue, the health services coordinator is required to evaluate, investigate, and decide the matter within thirty days. *Id.* at 8.9(12)(A). If the inmate is not satisfied with the response to his or her request for review, he or

she may appeal the decision within ten business days of receiving the decision. *Id.* at 8.9(12)(B). The health services provider or the designated facility health services director must decide the appeal "within fifteen business days of receiving the appeal." *Id.* at 8.9(12)(C). If the issue being raised "relates to a health services policy of the Department, the inmate may appeal to the DOC Director of Health Services within ten business days of" receiving the decision from the health services provider or designated facility health services director. *Id.* at 8.9(12)(D).

Additional facts are necessary to resolve this issue.

Plaintiff filed three Health Services Review grievances. All three grievances have "All Other Health Care Issues" marked as the type of review requested. The first grievance, dated October 18, 2020, stated that he experienced "extreme pain in my head, eyes, and nausea upon his arrival at Corrigan." Ex. F, ECF No. 66-10 at 22. He noted that he "began submitting sick call slips daily on the 9th of September." *Id.* Plaintiff then wrote that on "the 14th of September, after going to medical," he was taken via ambulance and then helicopter to Hartford Hospital, where he had surgery for "blood on the brain." *Id.* Plaintiff stated that the "crux of his grievance" is the time that it took medical to see him and while he complained of extreme pain, they showed deliberate indifference to his suffering. *Id.* He requested "all staff responsible for ignoring" his multiple sick calls/slips to be terminated and that "CDC policy" be changed that all future sick calls from him be responded to immediately. *Id.* The grievance reflects that it was received on October 26, 2020. This grievance was returned without disposition on November 9, 2020 because inmates "do not dictate how staff issues are addressed," Plaintiff was housed somewhere "nursing staff were able to treat [his] medical issues," and there is no "'CDC' policy regarding sick call slips." *See id.* at 23.

Shortly after the first grievance was returned without disposition, Plaintiff filed a second Health Services Review grievance, dated November 12, 2020. This grievance similarly detailed the same series of events and complaints as his first grievance. *See id.* at 18. However, Plaintiff also noted therein that he was "not seen or examined by anyone from medical until the 14th of September – a full five (5) days later" *Id.* He complained that the "nurse(s) met with me, asked a series of basic questions and was in process of having me returned to my unit" when he "started experiencing an episode of uncontrolled hiccup . . . which a nurse Jane Doe identified as a possible symptom(s) of neurological damage." *Id.* He stated that his injuries were the result of a failure to promptly reply or examine/diagnose him in a timely manner and that he was attempting to exhaust his administrative remedies because there is "no real remedy" that the Department of Correction could provide him as the damage "[was] already done." *Id.* at 18–19. The grievance reflects that it was received on November 20, 2020, but was also returned without disposition on November 19, 2020, because a request to exhaust administrative remedies is "neither meaningful nor appropriate and does not help to resolve and fix issues." *Id.* at 20.

Following return of the second grievance, Plaintiff filed a third and final grievance, dated November 23, 2020, which also detailed the same series of events and complaints as his prior grievances. Plaintiff specifically noted that on September 14, 2020, he was seen by Nurse Jane Doe, who "asked a series of perfunctory questions" and was in the process of sending him back to housing when he began hiccupping, at which time Nurse Janes Doe "surmised this to be indicative of serious neurological issue(s)" and an ambulance was called. *Id.* at 15. Plaintiff requested that an investigation be conducted and evidence preserved, citing to Administrative Directive 8.9(12)(A). *See id.* at 15–16. This grievance was rejected on December 7, 2020 because his grievance "is not the purpose of a Health Services Review. You are requesting that a full

investigation is done, preserving evidence? HSR coordinator is not a lawyer, nor an 'investigator.'" *Id.* at 15.

Defendant contends that Plaintiff's grievances were insufficient to exhaust his administrative remedies not because they sought specific relief that was rejected or because they were untimely, but because none of the three grievances pertain to the claims alleged in this action against Defendant. Specifically, Defendant contends that Plaintiff did not exhaust his administrative remedies because he failed to check the "Diagnosis/Treatment" box on his Health Services Review grievances and that none of Plaintiff's three grievances mention his September 13, 2020 visit with Defendant. In response, Plaintiff contends that he properly exhausted his administrative remedies because they were unavailable to him. *See* ECF No. 72 at 12. The Court addresses each argument in turn.

First, the Court is not persuaded that the exhaustion issue turns on whether Plaintiff checked the "Diagnosis/Treatment" box on the grievance form.

It is abundantly clear from the content of Plaintiff's grievances that he was seeking an evaluation and investigation of the events leading up to, and including, his two emergency surgeries. By the time Plaintiff submitted his grievances, his initial medical complaint of headaches and related symptoms had resolved. Indeed, in his November 12, 2020 grievance, Plaintiff wrote that the damage was already done. *See* Ex. F, ECF No. 66-10 at 18. A Diagnosis/Treatment Health Services Review may have been appropriate if Plaintiff had been experiencing headaches, was seen by a medical professional, and was unhappy if he was diagnosed with having a regular headache and a prescription of Tylenol and wanted a second opinion. Indeed, the Administrative Directive contemplates such a scenario, requiring the Health Services Review Coordinator to schedule a Health Services Review Appointment with a physician or an APRN as soon as possible.

*See* A.D. 8.9(11)(A). At no point did Plaintiff claim, or has claimed, that the relief he was seeking was further treatment of his headaches. And, at no point, in either returning his grievances without disposition or in rejecting his grievances, was Plaintiff informed that he should be requesting a Diagnosis/Treatment Health Services Review. In this regard, it may well be that the remedies outlined in Directive 8.9 were not available to him "in that the reviewer failed to properly respond to the type of review requested." *See Braham v. Perelmuter*, No. 3:15-cv-1094 (JCH), 2017 WL 3222532, at *10 (D. Conn. July 28, 2017) (citing *Ross*, 136 S. Ct. at 1859)).

Second, the Court concludes that there is a genuine dispute of material fact as to whether Plaintiff's grievances were sufficient to put Defendant on notice of the claims against her.

In all three grievances, Plaintiff discussed September 14, 2020, the date he was "actually seen." In his November 23, 2020, grievance, he described being seen by a Nurse Jane Doe and then, while in the process of being returned to his housing unit, being stopped by another Nurse Jane Doe who recognized that his medical symptoms presented as much more serious. *See* Ex F., ECF No. 66-10 at 15. In his November 12, 2020 grievance, he describes being seen by "nurse(s)," implying more than one nurse, who asked him a series of basic questions until he began hiccupping, which a Nurse Jane Doe recognized as a symptom of neurological damage. *See id.* at 18.

Plaintiff testified in his deposition that he mixed up Defendant and Nurse Cann and clarified that he spoke with Defendant on September 13 and then Nurse Cann on September 14. Burrell Dep. 20:4–9, ECF No. 66-12 at 21. He also testified that he got into an argument with Defendant on September 13. *Id.* at 23:5–6, ECF No. 66-12 at 23–24. Plaintiff argues that he mixed up the nurses and that he knew Defendant was dismissive of his complaints. *See* ECF No. 72 at 16. This apparent confusion is consistent with his Complaint, filed March 15, 2021, in which he

identifies September 14, 2020, as the date he was "finally seen" by Defendant. ECF No. 1 at 8 ¶ 19. Plaintiff alleged that during their brief encounter, Defendant "appeared bored, disinterested and somewhat perturbed" that he was "wasting her time." *Id.* at 9 ¶ 20.

Indeed, Defendant appears to concede that there is ambiguity in Plaintiff's grievances, noting that the November 23, 2020 grievance "seems to reference Plaintiff's visit with Nurse Cann, on September 14, 2020." ECF No. 66-1 at 15. Such information was in fact available to Defendant to at least respond to Plaintiff's grievances, as the Department of Correction had access to his medical records, which contains a record of the September 13, 2020 visit with Defendant. Moreover, an incident report regarding Plaintiff's emergency hospitalization was prepared by Donald Williams, wherein he notes he spoke to Defendant, who had seen Plaintiff the day prior and alleged that he had been having problems walking and feeling dizzy for two days and had been experiencing headaches for two weeks. *See* Incident Rep. Ex. B, ECF No. 66-6 at 3. There is, at the very least, a reasonable interpretation of the grievance that Plaintiff was attempting to exhaust his administrative remedies as to Defendant in connection with his alleged inadequate treatment leading up to his hospitalization on September 14, 2020. *See Espinal v. Goord*, 558 F.3d 119, 128 (2d Cir. 2009) ("The grievance alleged that Green Haven's Medical Department, its medical personnel, and prison officials refused to allow Espinal to attend his scheduled medical appointments. This was a sufficient description of the alleged wrong. The State's assertion that the grievance "failed to provide prison officials with sufficient notice of wrongdoing to cause them to investigate any such claim" cannot be squared with the" fact that the information in the grievance "enabled the State to investigate Espinal's claim that he was denied access to medical care.").

That Plaintiff "didn't specifically name the defendants in the grievance was a mere technical defect that had no effect on the process and didn't limit the usefulness of the exhaustion

requirement." *Maddox v. Love*, 655 F.3d 709, 722 (7th Cir. 2011) (citing *Jones*, 549 U.S. at 219). At least one of Plaintiff's grievances was addressed on the merits on December 7, 2020, at which point, it was rejected because that was apparently not the purpose of a Health Services Review, and not because Plaintiff failed to give enough information for prison officials to identify the medical professionals Plaintiff interacted with leading up to and including September 14, 2020. *See id*; *see also Trimble v. Grounds*, 3:14-cv-1164 (SMY) (RJD), 2016 WL 7337956, at *2 (S.D. Ill. Dec. 19, 2016) (grievance that states in "general terms" that plaintiff was not receiving proper medical treatment and asserting that "prison doctors, staff and or administration" had been deliberately indifferent to his medical needs is "generally insufficient" to exhaust administrative remedies, but prisoners "cannot be expected to identify what they do not know. Here, [plaintiff's] grievance adequately put the prison administration on notice of his concerns and it was addressed on the merits"); *Spratt v. Rangel*, No. 19-c-50085 (JRB), 2020 WL 1888929, at *3 (N.D. Ill. Apr. 16, 2020) (while grievance that was ambiguous in some respects as to which correctional officer or officers he interacted with "could have provided additional details and been worded in a less confusing way, it included enough specificity about the bug issue—as well as the staff involved with that particular issue—for the prison administration to conduct an investigation"). Indeed, Plaintiff's prior two grievances were returned without disposition, and neither noted an issue or concern with an inability to identify the medical personnel who saw Plaintiff. *See* Ex. F, ECF No. 66-10 at 20, 23.

Accordingly, drawing "all permissible factual inferences in favor of the party against whom summary judgment is sought," *Johnson v. Killian*, 680 F.3d at 236, the Court concludes that there is a genuine issue of material fact as to whether Plaintiff's requests for a Health Services Review

were sufficient to put Defendant on notice of the claims against her and therefore whether Plaintiff exhausted his administrative remedies.

*Deliberate Indifference to Medical Needs*

Defendant next argues that even if there is a question of fact as to whether he exhausted his remedies, or even if he is deemed to have exhausted his remedies, Plaintiff cannot establish that she was deliberately indifferent to his subdural hematoma. Plaintiff responds that he has asserted sufficient facts to demonstrate that with a reasonable inquiry, his subdural hematoma would have been discovered, and that Defendant delayed or denied him treatment for this serious injury.

The Eighth Amendment prohibits deliberate indifference to an inmate's serious medical need or medical condition by medical staff members as well as correctional staff members. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976) (deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed"). An inmate must meet two elements to state a claim that a custody official or medical provider was deliberately indifferent to his medical needs. The first requires the inmate to assert facts to demonstrate that his medical need or condition is objectively serious. *Hill v. Curcione*, 657 F.3d 116, 122–23 (2d Cir. 2011) (a serious medical need contemplates "a condition of urgency" such as "one that may produce death, degeneration, or extreme pain") (internal quotation marks and citation omitted).

In determining the seriousness of a medical condition, the Court considers whether "a reasonable doctor or patient would find [it] important and worthy of comment," whether the condition "significantly affects an individual's daily activities," and whether it causes "chronic

and substantial pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citations omitted). If a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," rather than a denial of any treatment for his or her condition, "it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious,' to support an Eighth Amendment claim." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (quoting *Chance*, 143 F.3d at 702).

Plaintiff must also establish that Defendant was deliberately indifferent to this serious medical condition or need. To meet his burden, Plaintiff must allege that Defendant was actually aware that her actions or inactions would cause a substantial risk of serious harm. *See Hill*, 657 F.3d at 122 ("[T]he official must 'know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'") (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)). Mere negligent or inadvertent conduct, however, does not constitute deliberate indifference. *See Estelle*, 429 U.S. at 105-06 (deliberate indifference requires a greater showing than simply "an inadvertent failure to provide adequate medical care" or "negligen[ce] in diagnosing or treating a medical condition").

Courts within the Second Circuit have found that treatment delays can satisfy these requirements where there was a needlessly prolonged delay, or where officials deliberately delayed the treatment as a form of punishment or ignored a life-threatening and fast-degenerating condition. *See Brockett v. Lupis*, No. 3:21-cv-355 (KAD), 2022 WL 1658835, at *8 (D. Conn. May 25, 2022); *Feliciano v. Anderson*, No. 15-cv-4106 (LTS) (JLC), 2017 WL 1189747, at *11 (S.D.N.Y. Mar. 30, 2017) ("Although a delay in providing necessary medical care may in some

cases constitute deliberate indifference, [the Second Circuit] has reserved such a classification for cases in which, for example, officials deliberately delayed care as a form of punishment; ignored a 'life-threatening and fast-degenerating' condition for three days; or delayed major surgery for over two years.") (quoting *Demata v. N.Y. State Corr. Dep't of Health Servs.*, 198 F.3d 233 (2d Cir. 1999)). A "delay in treatment does not violate the Constitution unless it involves an act or failure to act that evinces 'a conscious disregard of a substantial risk of serious harm.'" *Thomas v. Nassau Cnty. Corr. Ctr.*, 288 F. Supp. 2d 333, 339 (E.D.N.Y. 2003) (quoting *Chance*, 143 F.3d at 703).

*Objective Prong*

Defendant argues that Plaintiff's allegations fail to meet the objective prong because the delay did not worsen his condition because his pain was already "10 out of 10" when he saw her and both experts agree that Plaintiff would have needed surgery had the subdural hematoma been discovered a week prior. The Court disagrees.

The delay arguably "caused . . . symptoms of his underlying illness to worsen, [or] . . . materially altered the way in which his disease thereafter affected him." *Ferguson v. Cai*, No. 11-CV-6181, 2012 WL 2865474, at *4 (S.D.N.Y. July 12, 2012) (citation omitted); *see also Sassower v. City of White Plains*, No. 89-cv-1267, 1995 WL 222206, at *8 (S.D.N.Y. Apr. 13, 1995) ("The seriousness of a medical need may be also be determined by reference to the effect of denying or delaying medical treatment."). When Plaintiff saw Defendant, his symptoms were a "ten" on a scale of one to ten, and he thought he was "dying" and like he "wasn't going to wake up in the morning." Roughly 20 hours after seeing Defendant (and presumably having continued to suffer from ten out of ten pain for 20 hours), Plaintiff's condition worsened to the point that he was exhibiting additional symptoms and was accordingly rushed to the hospital via emergency medical

transport, where a CT scan revealed that Plaintiff had a subdural hematoma. Immediately thereafter, Plaintiff was transported to another hospital via helicopter for emergency neurosurgery. *See e.g.*, *Wright v. County of Franklin, Ohio*, 881 F. Supp. 2d 887, 898–99 (S.D. Ohio 2012) ("As a result of the delay in diagnosis and treatment, Plaintiff was later rushed to the hospital and subjected to emergency surgery. The nature of the condition further led to subsequent surgeries. The fact that Plaintiff's condition led to emergency surgery satisfies the objective requirement of a 'sufficiently serious' medical need."). The Court concludes that Plaintiff's condition was sufficiently serious under the objective prong.

*Subjective Prong*

Defendant next argues that it cannot be established that she was "actually aware" that Plaintiff was suffering from a subdural hematoma on September 13, 2020.

Importantly, the crucial facts that would dictate the outcome of this case are in dispute, and the Court cannot make the credibility assessments necessary to resolve those disputed facts. "Credibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the court on a motion for summary judgment." *Patterson v. Quiros*, No. 3:19-cv-147 (MPS), 2021 WL 681144, at *11 (D. Conn. Feb. 22, 2021) (quoting *Fischl v. Armitage*, 128 F.3d 50, 55 (2d Cir. 2017)); *Leavitt v. Corr. Med. Servs., Inc.*, 645 F.3d 484, 498 (1st Cir. 2011) ("The district court was too quick to decide that [the doctor's] version was credible and [the plaintiff's] not. This is precisely the sort of genuine and material dispute that ought to be resolved by a jury.").

Defendant could not recall if she read the sick call slip that Plaintiff submitted on September 11, 2020, in which he complained of severe headaches, inability to sleep, periodic nausea, and a loss of appetite. Marceau Aff. Ex. D, ECF No. 66-8 at 3 ¶ 11; Ex. A2, ECF No. 68

at 916. Defendant believed that the headaches and nausea were the result of Plaintiff's recent transfer to Corrigan, and noted in the medical records that Plaintiff's response to that suggestion was "maybe." Marceau Aff. Ex. D, ECF No. 66-8 at 4 ¶ 15; Ex. A2, ECF No. 68 at 916. Defendant's medical notes indicate a 9-pound weight loss, headaches for the past two weeks that went away a week prior, and a note that he was eating less and had vomited once. Ex. A2, ECF No. 68 at 917. However, in the Incident Report, Defendant had reported that Plaintiff had "been having problems walking and feeling dizzy for the last 2 days," and had been having headaches for approximately two weeks but that the headache had been subsiding in the last week. Incident Rep. Ex. B, ECF No. 66-6 at 3. In his deposition, Plaintiff testified that he told Defendant that he was having problems walking, was dizzy, and had headaches for two weeks, and also reported that he had vomited three or four times, was losing balance when getting down from his top bunk, and had an aversion to light. Defendant now alleges that she did not observe Burrell exhibiting any confusion, unsteadiness, or difficulty walking, despite informing Donald Williams that Plaintiff had been having problems walking and feeling dizzy for two days.

Viewing these disputed facts in the light most favorable to Plaintiff, as the Court must on summary judgment, a jury could reasonably find that Defendant failed to conduct a more exhaustive examination of Plaintiff despite his complaints of pain, dizziness, trouble walking, and vomiting, "which could permit a finding of deliberate indifference arising from Defendant's cursory or apathetic treatment." *Tyson v. Sesay*, No. 3:20-cv-296 (SVN), 2022 WL 4467021, at *4 (D. Conn. Sept. 26, 2022); *see also Faraday v. Lantz*, No. 3:03-cv-1520 (SRU), 2005 WL 3465846, at *6 (D. Conn. Dec. 12, 2005) (denying a doctor's motion for summary judgment because a jury could find that, "without trying to determine the source or cause of [the plaintiff's] complaints of severe pain, [the doctor] simply dismissed his complaints"). Defendant did not ask

Plaintiff if there were any aggravating or alleviating factors for his headaches. Marceau Dep. 124:15-17, ECF No. 73-3 at 25. She did not recall if she inquired of a history of headaches, similar headaches or a history of high blood pressure, seizures, head injury, falls, or bleeding disorders. *Id.* at 124:18-125:1. She did not recall asking him how long his headaches were lasting. *Id.* at 103:16-18. She did not ask where the pain of the headaches was on a scale of one to ten. *Id.* at 103:19-21. She did not ask him if he had a recent fall. *Id.* at 125:23-25. Such actions could evince a "conscious disregard of a substantial risk of serious harm," given the alleged symptoms, and therefore could support a conclusion that Defendant was deliberately indifferent in violation of the Eighth Amendment. *Tyson*, 2022 WL 4467021, at *4 (citing *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996)).

Defendant argues that she could not have been deliberately indifferent because it is unlikely that any medical provider would have recognized that Plaintiff needed a CT scan or had a subdural hematoma. Defendant's coworkers, Nurses Cann and Valentukonis, testified that symptoms such as confusion, dizziness, and trouble walking were sufficiently serious symptoms that a nurse would require further assessment. *See* Valentukonis Dep. 28:21-24, ECF No. 73-7 at 11; Cann Dep. 77:21-78:5, 107:19-108:2, ECF No. 73-9 at 24, 31. In light of the disputed facts regarding his condition, his symptoms, and Defendant's evaluation, there is a genuine dispute as to whether Defendant "consciously [chose] an easier and less efficacious treatment plan," exhibiting deliberate indifference to Plaintiff's medical needs. *Chance*, 143 F.3d at 703 (quoting *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974), for the proposition that the "choice of an easier but less efficacious course of treatment can constitute deliberate indifference").[2]

---

[2] Defendant last argues that Plaintiff cannot establish causation because "there is no evidence whatsoever that Plaintiff suffered any additional harm caused by" her actions. ECF No. 66-1 at 33. The Court disagrees. To recover damages in a § 1983 suit, a plaintiff must show an "affirmative causal link" between the personal involvement of the defendant and the plaintiff's constitutional injury. *Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002). Here, there is a

*Qualified Immunity*

Defendant last contends that, even if she was deliberately indifferent to Plaintiff's medical needs, she is entitled to qualified immunity.

"[Q]ualified immunity protects government officials from suit if 'their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "When a defendant invokes qualified immunity to support a motion for summary judgment, courts engage in a two-part inquiry: whether the facts shown 'make out a violation of a constitutional right,' and 'whether the right at issue was clearly established at the time of defendant's alleged misconduct.'" *Taravella v. Town of Wolcott*, 599 F.3d 129, 133 (2d Cir. 2010) (quoting *Pearson v. Callahan*, 555 U.S. 223, 129 S. Ct. 808, 815–16 (2009). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Taylor v. Barkes*, 575 U.S. 822, 135 S. Ct. 2042, 2044 (2015). "Rights must be clearly established in a 'particularized' sense, rather than at a high level of generality, *Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017), and while "a case directly on point" is not required, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).

 "Therefore, an official is entitled to qualified immunity if, considering the law that was clearly established at the time, the official's conduct was 'objectively legally reasonable.'" *Nazario v. Thibeault*, No. 3:21-cv-216 (VLB), 2022 WL 2358504, at *8 (D. Conn. June 30, 2022) (quoting *Taravella*, 599 F.3d at 133). "The objective reasonableness of an official's conduct 'is a mixed

---

genuine dispute of material as to whether Defendant was unduly dismissive of Plaintiff's complaints such that she was deliberately indifferent to Plaintiff's sufficiently serious medical needs of extreme pain. A reasonable juror could conclude that had Defendant requested or done a further assessment of Plaintiff, his subdural hematoma would have been discovered, and thus, Plaintiff has raised a genuine dispute as to Defendant's liability under § 1983.

question of law and fact.'" *Id.* "At the summary judgment stage, while a conclusion that an official's conduct 'was objectively reasonable as a matter of law may be appropriate where there is no dispute as to the material historical facts, if there is such a dispute, the factual question must be resolved by the factfinder.'" *Id.*

Summary judgment is improper at this time with respect to the objective legal reasonableness of Defendant's actions, for many of the same reasons that summary judgment is improper with respect to Defendant's conscious disregard of a substantial risk of serious harm to Plaintiff's health. *See Tyson*, 2022 WL 4467021, at *7; *Braham*, 2017 WL 3222532, at *18 (reasoning that the same "issues of fact" informing the question of whether the dentist was deliberately indifferent to the plaintiff's medical needs "preclude a finding that [the dentist] is entitled to qualified immunity"). In September of 2020, it was clearly established that actions such as those at issue here—a medical professional's allegedly cursory and apathetic evaluation of a patient, dismissive consideration of the patient's self-reported pain and other serious symptoms, and choice of a less effective treatment possibly based on considerations other than sound medical judgment—could constitute deliberate indifference to a serious medical condition in violation of the Eighth Amendment. *See Chance*, 143 F.3d at 703–04; *Faraday*, 2005 WL 3465846, at *6.

"Although qualified immunity is a question of law, because [the] issue of reasonableness depends on the facts of the situation, if there is a dispute as to the facts, that must be resolved by the factfinder before qualified immunity can be granted." *Maye v. Vargas*, 638 F. Supp. 2d 256, 262 (D. Conn. 2009). As to each of these critical facts, the parties cite to portions of the record evidence as supporting their competing narratives. Here, the Court cannot measure the reasonableness of Defendant's actions because "there are facts in dispute that are material to a

determination of reasonableness," rendering summary judgment inappropriate. *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999).

**Conclusion**

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED as to Defendant Feder and DENIED in all other respects. (ECF No. 66) The Clerk of the Court is directed to terminate Defendant Feder.

**SO ORDERED** at Bridgeport, Connecticut, this 8th day of December 2023.

 */s/ Kari A. Dooley*
KARI A. DOOLEY
UNITED STATES DISTRICT JUDGE